Carly Roman (SBN 349895)
croman@straussborrelli.com
STRAUSS BORRELLI PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109

*Attorneys for Plaintiff and Proposed Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DOUGLAS COCHRANE**, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**ARIXA CAPITAL ADVISORS, LLC,**<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **NEGLIGENCE;**<br>2. **NEGLIGENCE PER SE;**<br>3. **BREACH OF IMPLIED CONTRACT**<br>4. **UNJUST ENRICHMENT**<br>5. **INVASION OF PRIVACY**<br>6. **BREACH OF FIDUCIARY DUTY**<br>7. **DECLARATORY JUDGMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Douglas Cochrane ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Arixa Capital Advisors, LLC, ("Arixa Capital" or "Defendant"), alleging as follows, based upon information and belief, investigation of counsel, and personal knowledge of Plaintiff.

## INTRODUCTION

1. This class action arises from Defendant's failure to protect its current and former employees' highly sensitive data.

2. Arixa Capital recently discovered it had lost control over its computer network and that on November 13, 2024, cybercriminals accessed and "potentially downloaded certain files" containing highly sensitive personal information stored on its computer network.

3. Arixa Capital has not publicly disclosed who was impacted (*e.g.,* current employees, former employees, clients, customers, etc.) or the complete categories of information compromised in the Data Breach. However, based on the Notice Plaintiff received, at minimum the names, addresses and Social Security numbers of Arixa Capital's employees were stolen. Plaintiff refers to the stolen sensitive information "PII."

4. On or about December 27, 2024, Arixa Capital finally began notifying some Class Members about the Data Breach. The Notice located on the website of the Massachusetts Attorney General's Office is attached as Exhibit A. Plaintiff's Notice, dated January 7, 2025, is attached as Exhibit B (the "Notice").

5.      Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the PII of Plaintiff, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII—rendering it an easy target for cybercriminals.

6.      Defendant's Notice obfuscates the nature of the Data Breach and the threat it posed. The Notice failed to disclose how many people were impacted, the categories of information acquired, who was impacted (*e.g.*, employees or customers or both), how long cybercriminals had access to private information, how the Data Breach happened, when Defendant stopped the Data Breach, and why Defendant waited before notifying victims that cybercriminals had gained access to their highly private information.

7.      Defendant's deliberate failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

8.      Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

9.      In failing to adequately protect its employees' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendant violated state law and harmed an unknown number of its current and former employees and clients.

10.    Plaintiff and the Class are victims of Defendant's negligence and inadequate cybersecurity measures. Specifically, Plaintiff and members of the proposed Class trusted Defendant with their PII. But Defendant betrayed that trust when Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

11.    Plaintiff Douglas Cochrane is a victim of the Data Breach. His name, address, and Social Security number were exposed during the Data Breach.

12.    The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiff and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

13.    Plaintiff seeks on behalf of himself and the Class, monetary damages and injunctive relief including lifetime credit monitoring and ID theft monitoring.

**PARTIES**

14.    Plaintiff, Douglas Cochrane, is a natural person and citizen of Playa Vista, CA located in Los Angeles County, where he intends to remain.

15.    Defendant Arixa Capital Advisors, LLC, is a limited liability company with its headquarters and principal place of business located at 10960 Wilshire Boulevard, Suite 1050, Los Angeles, CA 90024. It also has an office in Phoenix, AZ.

**JURISDICTION AND VENUE**

16.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy

exceeds $5 million, exclusive of interest and costs. Members of the proposed Class are citizens of different states than Defendant and there are over 100 putative Class members.

17.    This Court has personal jurisdiction over Defendant because it maintains its headquarters and principal place of business in this District, regularly conducts business in Los Angeles, California, and has sufficient minimum contacts in Los Angeles, California.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1)–(d) because Defendant's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## BACKGROUND

### *Defendant Collected and Stored the PII of Plaintiff and the Class*

19.    Arixa Capital is a private real estate lender and investment manager based in California.  Founded in 2006, Arixa Capital specializes in providing bridge, renovation, and construction loans to professional real estate investors, developers, and builders.[1] Focused on working with experienced borrowers who have a history of creating substantial value with their projects, Arixa Capital has originated more than $5 billion in loans.[2] Headquartered in Los Angeles, California, Arixa Capital

---

[1] *What we do,* ARIXA CAPITAL,  https://www.arixacapital.com/who-we-are (last visited May 23, 2025).
[2] *Arixa Capital,* LINKEDIN, https://www.linkedin.com/company/arixa-capital-advisors/about/  (last visited May 23, 2025).

has an additional lending office in Phoenix, Arizona.[3]

20.    Arixa Capital is licensed with the California Department of Financial Protection and Innovation. In California, all loans are made or arranged by Arixa Capital Advisors, LLC pursuant to a California Finance Lenders Law license No. 60DBO-98673 (NMLS ID No. 2318142). Arixa Capital also originates loans in Arizona.[4]

21.    On information and belief, Arixa Capital accumulates highly private PII of its employees and clients. Given its age, Arixa Capital has accrued approximately 20 years of data and contracts.

22.    In collecting and maintaining its employees' and  clients' PII, Arixa Capital agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

23.    Arixa Capital understood the need to protect its current and former employees' PII and prioritize its data security.

24.    In its Privacy Policy, Arixa Capital states: "We do not share your personal information with third parties without your consent, except as described in this Privacy Policy." Arixa Capital also represents: "The security of your personal information is important to us. We employ a number of administrative, technical, and physical safeguards designed to protect the personal information we collect. The safety and security of your information also depends on you. Where we have given

---

[3] *Supra,* fn. 1.
[4] *Supra,* fn. 2.

you (or where you have chosen) a password for access to certain parts of our Site, you are responsible for keeping this password confidential. We ask you not to share your password with anyone. We urge you to be careful about giving out information in public areas of the Site."[5] Likewise, in its Data Breach Notice to Massachusetts residents, Arixa Capital states it "takes privacy and security of all information within its possession very seriously." Ex. B.

25.    Despite recognizing its duty to do so, on information and belief, Arixa Capital has not implemented reasonable cybersecurity safeguards or policies to protect the PII of its current and former employees, or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Arixa Capital leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to employees and customers' PII.

### ***Defendant Failed to Safeguard the PII of Plaintiff and the Class***

26.    Plaintiff is a former employee of Defendant.

27.    Plaintiff received Defendant's Notice on or around January 7, 2025, informing him that his PII was compromised, including his name and Social Security number. Ex. B.

28.    Plaintiff was surprised Defendant still retained his PII, considering he was not an employee of Arixa Capital at the time of the Data Breach. Plaintiff reasonably expected that his PII would be deleted once his employment relationship with Arixa Capital ended.

---

[5] *Privacy Policy,* ARIXA CAPITAL https://www.arixacapital.com/privacy-policy (last visited May 23, 2025).

29. As a condition of receiving employment from Defendant, Plaintiff provided Defendant with his PII.

30. On information and belief, Defendant collects and maintains its current and former employees' unencrypted PII in its computer systems.

31. In collecting and maintaining PII, Defendant implicitly agreed that it will safeguard the data using reasonable means according to state and federal law.

32. On November 13, 2024, Defendant became aware cybercriminals hacked its network and "potentially" downloaded files containing extremely sensitive information, including Social Security numbers.

33. Defendant did not disclose how many people were impacted, but, upon information and belief, at least residents in California, Arizona, and Massachusetts were impacted.

34. The Data Breach shows Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of of its employees' and customers' highly private information for an unknown period of time.

35. On or about December 27, 2024, Defendant finally began notifying some Class Members the Data Breach. Ex. A.

36. Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

37. Despite its duties to safeguard PII, Defendant did not in fact follow industry standard practices in securing current and former employees' PII, as evidenced by the Data Breach.

38.     Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection. Defendant had no need of Plaintiff's Social Security number once his employment at Arixa Capital ended, and should have promptly deleted it.

39.     In response to the Data Breach, Defendant contends "we took the steps to secure our environment" and "we have implemented several measures to enhance our security postures and reduce the risk of similar future incidents." Ex. B. Although Defendant fails to expand on what these "several measures" are in any detail, such "measures" if implemented at all, should have been in place before the Data Breach.

40.     Through its Notice, Defendant recognized the actual imminent harm and injury that flowed from the Data Breach, so it encouraged breach victims to "remain vigilant by reviewing your account statements and monitoring free credit reports closely for errors and by taking other steps appropriate to protect accounts, including promptly changing passwords." Ex. B.

41.     Despite advising its current and former employees to remain vigilant, Defendant waited an unreasonable amount of time before it began notifying victims, depriving Plaintiff and the Class of the earliest opportunity to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

42.     On information and belief, Defendant has offered complimentary credit monitoring services to victims, which does not adequately address the lifelong harm

that victims will face following the Data Breach. Indeed, the information compromised involves PII that cannot be changed, such as Social Security numbers.

43.    Even with several months of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

44.    Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII (although in Plaintiff's case, his Social Security number was compromised). Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff and the Class's financial accounts.

45.    On information and belief, Defendant failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its employees' PII. Defendant's negligence is evidenced by its failure to prevent the Data Breach, and to stop cybercriminals from accessing the PII it stored in its network.

46.    Furthermore, Defendant's Notice obfuscates the nature of the Data Breach and the threat it posed. The Notice failed to disclose how many people were impacted, the categories of information acquired, who was impacted (*e.g.*, employees or customers or both), how long cybercriminals had access to private information, how the Data Breach happened, when Defendant stopped the Data

Breach, and why Defendant waited before notifying victims that cybercriminals had gained access to their highly private information.

### ***Defendant Knew—or Should Have Known—of the Risk of a Data Breach***

47.    It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

48.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years. In light of past high profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or, if acting as a reasonable business, should have known that the PII it collected and maintained would be vulnerable to and targeted by cybercriminals.

49.    In 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[6]

50.    Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are

---

[6] *2024 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter. org/publication/2024-data-breach-report/ (last visited May 23, 2025).

1    attractive to ransomware criminals . . . because they often have lesser IT defenses

2    and a high incentive to regain access to their data quickly."[7]

3         51.    Therefore, the increase in such attacks, and attendant risk of future

4    attacks, was widely known to the public and to anyone in the finance industry,

5    including Defendant.

6         52.    Despite the prevalence of public announcements of data breach and

7    data security compromises, and despite its own acknowledgments of data security

8    compromises, and despite its own acknowledgment of its duties to keep PII private

9    and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiff

10   and Class Members from being compromised.

11        53.    This readily available and accessible information confirms that, prior

12   to the Data Breach, Defendant knew or should have known that (i) ransomware

13   actors were targeting entities such as Defendant, (ii) ransomware gangs were

14   ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware

15   gangs were leaking corporate information on dark web portals, and (iv) ransomware

16   tactics included extortion and threatening to release stolen data.

17        54.    In light of the information readily available and accessible before the

18   Data Breach, Defendant, knew or should have known that there was a foreseeable

19   risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and

20   published as the result of a cyberattack. Data breaches are so prevalent in today's

21

22   [7] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18,
23   2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-
     targeted-ransomware (last visited May 23, 2025).

24

society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

***Plaintiff's Experience and Injuries***

55.    Plaintiff is a former employee of Defendant and a data breach victim.

56.    As a condition of receiving employment, Defendant required Plaintiff to provide his PII, including at least his name and Social Security number.

57.    Plaintiff provided his PII to Defendant and trusted that the company would use reasonable measures to protect it according to state and federal law.

58.    Additionally, Plaintiff reasonably expected that his personal information would be destroyed once his employment with Defendant ended.

59.    As a result of its inadequate cybersecurity measures and data destruction policies, Defendant exposed Plaintiff's PII for theft by cybercriminals and sale on the dark web.

60.    Plaintiff does not recall ever learning that his PII was compromised in former a data breach incident, other than the breach at issue in this case.

61.    Defendant deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

62.    Plaintiff suffered actual injury from the exposure of his PII —which violates his rights to privacy.

63.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

64.    As a result of the Data Breach, Plaintiff has spent time and made reasonable efforts to mitigate its impact, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit information.

65.    Plaintiff will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft, just as Defendant directed him to do in its Notice.

66.    Plaintiff fears for his personal financial security. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff is experiencing anxiety, distress, and fear regarding how the exposure and loss of his Social Security number will impact him. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

67.    Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury is worsened by Defendant's failure to promptly inform Plaintiff about the Data Breach.

68.    Plaintiff has experienced a substantial increase in scam and spam phone calls and text messages following the Data Breach.

69.    Once an individual's PII is for sale and accessible on the dark web, cybercriminals are able to use the stolen and compromised to gather and steal even

more information.[8] Plaintiff's name, address, and Social Security number were compromised as a result of the Data Breach.

70.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendant's possession despite the fact he is no longer employed by Defendant, is protected and safeguarded from future breaches.

***Plaintiff and the Class Suffered Common Injuries and Damages Due to Defendant's Conduct***

71.    Defendant's failure to implement or maintain adequate data security measures for Plaintiff's and Class Members' PII directly and proximately injured Plaintiff and Class Members by the resulting disclosure of their PII in the Data Breach.

72.    Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, inter alia, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

   a.    identity theft and fraud;

   b.    loss of time to mitigate the risk of identity theft and fraud;

   c.    diminution in value of their PII;

   d.    out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

---

[8] *What do Hackers do with Stolen Information,* AURA, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited May 23, 2025).

e.    lost benefit of the bargain and opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, inter alia, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.    delay in receipt of tax refund monies;

g.    loss of the opportunity to control how their PII is used;

h.    compromise and continuing publication of their PII;

i.    unauthorized use of their stolen PII;

j.    invasion of privacy; and

k.    continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

### *Significant Risk of Continued Identity Theft*

73.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

74.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

75.    The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien

registration number, government passport number, employer or taxpayer identification number." *Id.*

76.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

77.     The dark web is an unindexed layer of the internet that requires special software or authentication to access.[9] Criminals in particular favour the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[10]     This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

78.     The unencrypted PII of Plaintiff and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII may fall into the hands of companies that will use it for

---

[9] *What Is the Dark Web?* EXPERIAN, available at https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited May 23, 2025).
[10] *Id.*

targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Plaintiff's and Class Members' PII.

79.    The value of Plaintiff's and Class's PII on the black market is considerable. Stolen PII trades on the black market for years and is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained. criminals frequently post and sell stolen information openly and directly on the "dark web"—further exposing the information.

80.    It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

81.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

82.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

83.     Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[11]

84.     One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[12] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly

---

[11] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited May 23, 2025).

[12] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited May 23, 2025).

complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

85.    The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

86.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[13]

87.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[14] Yet, Defendant failed to rapidly report to Plaintiff and the Class that their

---

[13] *2019 Internet Crime Report* (Feb. 11, 2020) FBI.GOV, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited May 23, 2025).
[14] *Id.*

PII was stolen. Defendant's failure to promptly and properly notify Plaintiff and Class members of the Data Breach exacerbated Plaintiff and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

88.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

89.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

90.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

91.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise

mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

92.   In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.

93.   Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate that harm.

94.   Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

95.   These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies

to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[15]

96.    Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

### *Diminished Value of PII*

97.    Personal data like PII is a valuable property right.[16]

98.    Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

99.    An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[17]

100.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn

---

[15] *See Federal Trade Commission*, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Steps (last visited May 23, 2025).

[16] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted) (last visited May 23, 2025).

[17] *Shadowy data brokers make the most of their invisibility cloak* (Nov. 5, 2019) LA TIMES, (last visited May 23, 2025).https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

aggregates the information and provides it to marketers or app developers.[18] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[19]

101.  As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the threat actors.

102.  However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

### *Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary*

103.  To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered due to the Data Breach.

104.  Given the type of targeted attack in this case and sophisticated criminal activity, the type of information involved, and the modus operandi of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals

---

[18]  *The Personal Data Revolutaion,* DATA COUP, https://datacoup.com/ *and How it Works,* DIGI.ME, https://digi.me/what-is-digime/  (last visited May 23, 2025).

[19] *Frequently Asked Questions*, NIELSE COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited May 23, 2025).

intending to utilize the PII for identity theft crimes— e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

105.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

106.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel their cards and request a replacement.[20]

107.    The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

108.    Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

109.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's

---

[20] Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds,* FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-securitynumber-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited May 23, 2025).

Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

### *Lost Benefit of the Bargain*

110.   Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

111.   When agreeing to provide their PII, which was a condition precedent to obtain employment from Defendant, Plaintiff and Class Members, as employees, understood and expected that they were, in part, paying for services and data security to protect the PII they were required to provide.

112.   Plaintiff values data security. Indeed, data security is an important consideration of seeking employment.

113.   In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[21] Therein, Cisco reported the following:

> a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[22]

---

[21] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, Cisco, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited May 23, 2025).
[22] *Id.* at 3.

b.      "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[23]

c.      89% of consumers stated that "I care about data privacy."[24]

d.      83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[25]

e.      51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[26]

f.      75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[27]

114.    Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

### *Defendant Could Have Prevented the Data Breach*

115.    Data breaches are preventable.[28] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and

---

[23] *Id.*
[24] *Id.* at 9.
[25] *Id.*
[26] *Id.*
[27] *Id.* at 11.
[28] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

implementation of appropriate security solutions."[29] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[30]

116.   "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [31]

117.   In a Data Breach like the one here, many failures laid the groundwork for the Breach.

118.   For example, the FTC has published guidelines that establish reasonable data security practices for businesses. The guidelines also emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

119.   Additionally, several industry-standard best practices have been identified that—at a minimum—should be implemented by businesses like Defendant.

### *Defendant Failed to Adhere to FTC Guidelines*

120.   According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that

---

[29] *Id.* at 17.
[30] *Id.* at 28.
[31] *Id.*

businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

121.   In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.   The guidelines explain that businesses should:

        a.     protect the personal customer information that they keep;

        b.     properly dispose of personal information that is no longer needed;

        c.     encrypt information stored on computer networks;

        d.     understand their network's vulnerabilities; and

        e.     implement policies to correct security problems.

122.   The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

123.   The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

124.   The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to

confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

125.   Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

### *Defendant Failed to Comply with the Gramm-Leach-Bliley Act*

126.   Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

127.   The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

128.   Defendant collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendant were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq.*, and is subject to numerous rules and regulations promulgated on the GLBA statutes.

129.   The GLBA Privacy Rule became effective on July 1, 2001. See 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that

established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

130.   Accordingly, Defendant's conduct is governed by the Privacy Rule prior to December 30, 2011 and by Regulation P after that date.

131.   Both the Privacy Rule and Regulation P require financial institutions to provide consumers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendant violated the Privacy Rule and Regulation P.

132.   Upon information and belief, Defendant failed to provide annual privacy notices to consumers after the relationship ended, despite retaining these

consumers' PII and storing that PII on Defendant's network systems.

133.  Defendant failed to adequately inform their consumers that they were storing and/or sharing, or would store and/or share, the consumers' PII on an insecure platform, accessible to unauthorized parties from the internet, and would do so after the relationship ended.

134.  The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of consumer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of consumer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of consumer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

135.  As alleged herein, Defendant violated the Safeguards Rule.

136.  Defendant failed to assess reasonably foreseeable risks to the security,

confidentiality, and integrity of consumer information.

137.   Defendant violated the GLBA and its own policies and procedures by sharing the PII of Plaintiffs and Class members with a non-affiliated third party without providing Plaintiffs and Class Member (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

### *Defendant Failed to Follow Industry Standards*

138.   Experts studying cybersecurity routinely identify financial corporations as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

139.   Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees regarding cybersecurity; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

140.   Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

141.   Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary

to achieve its initial purpose of collection. In line with industry standard practices, Defendant should have promptly deleted the data belonging to former customers and employees.

142.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established standards in reasonable cybersecurity readiness.

143.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

142.    Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach of Arixa Capital LLC's network, including all those individuals who received notice of the breach.

143.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant

officer or director, any successor or assign, and any Judge who adjudicates this case, including its staff and immediate family.

144.   Plaintiff reserves the right to amend the class definition.

145.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

146.   This action satisfies the numerosity, commonality, typicality, and adequacy requirements.

147.   **Numerosity.** The Class members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 9,667 members.

148.   **Commonality and Predominance.** Plaintiff's and the Class Members' claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

      a.    if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

      b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

      c.      if Defendant was negligent in maintaining, protecting, and securing PII;

      d.      if Defendant breached contract promises to safeguard Plaintiff and the Class's PII;

      e.      if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

      f.      if Defendant's Breach Notice was reasonable;

      g.      if the Data Breach caused Plaintiff and the Class injuries;

      h.      what the proper damages measure is; and

      i.      if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

149. **Typicality.** Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

150. **Adequacy.** Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

151. **Appropriateness.** The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case. Plaintiff is not aware of any litigation concerning this

controversy already commenced by others who meet the criteria for class membership described above.

152. **Ascertainability.**    All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some victims and sent them data breach notices.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

153. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

154. Plaintiff and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

155. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

156. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

157. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from

1  Defendant's inadequate security practices. After all, Defendant actively sought and

2  obtained Plaintiff's and Class Members' PII.

3      158.   Defendant owed—to Plaintiff and Class Members—at least the

4  following duties to:

5          a.   exercise reasonable care in handling and using the PII in its care

6              and custody;

7          b.   implement industry-standard security procedures sufficient to

8              reasonably protect the information from a data breach, theft, and

9              unauthorized;

10          c.   promptly detect attempts at unauthorized access;

11          d.   notify Plaintiff and Class Members within a reasonable

12              timeframe of any breach to the security of their PII.

13      159.   Also, Defendant owed a duty to timely and accurately disclose to

14  Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach.

15  After all, this duty is required and necessary for Plaintiff and Class Members to take

16  appropriate measures to protect their PII, to be vigilant in the face of an increased

17  risk of harm, and to take other necessary steps to mitigate the harm caused by the

18  Data Breach.

19      160.   Defendant also had a duty to exercise appropriate clearinghouse

20  practices to remove PII it was no longer required to retain under applicable

21  regulations.

22      161.   Defendant knew or reasonably should have known that the failure to

23  exercise due care in the collecting, storing, and using of the PII of Plaintiff and the

24

CLASS ACTION COMPLAINT – 37

Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

162.   Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of employment from Defendant.

163.   The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII —whether by malware or otherwise.

164.   PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff's and Class Members' and the importance of exercising reasonable care in handling it.

165.   Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

166.   Defendant breached these duties as evidenced by the first and second Data Breach.

167.   Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff 'and Class Members' PII by:

    a.   disclosing and providing access to this information to third parties and

b.      failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

168.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff's and Class Members' injury.

169.    Defendant further breached its duties by failing to provide a reasonable and timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and Class Members' injuries-in-fact.

170.    Defendant has admitted that the PII of Plaintiff and the Class was accessed by an intruder to its systems.

171.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

172.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's

negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence *per se*
### (On Behalf of Plaintiff and the Class)

173.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

174.    Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

175.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff's and the Class Members' sensitive PII.

176.    Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

177.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the

immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

178.   The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

179.   But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

180.   The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

181.   Defendant's violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

182.   As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### THIRD CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

183.   Plaintiff incorporates all previous paragraphs as if fully set forth herein.

184.  Through their course of conduct, Defendant, Plaintiffs, and Class Members entered into an implied breach of contract for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class Members' PII.

185.  For example, Defendant offered to provide employment and/or services to Plaintiff and members of the Class if, and in exchange, Plaintiff and members of the Class provided Defendant with their PII. In turn, Defendant agreed it would not disclose the PII it collects to unauthorized persons.

186.  Plaintiff and the members of the Class accepted Defendant's offer by providing PII to Defendant in exchange for Defendant's services.

187.  Implicit in the parties' agreement was that Defendant would provide Plaintiff and members of the Class with reasonable, prompt, and adequate notice of all unauthorized access and/or theft of their PII.

188.  Plaintiff and the members of the Class would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

189.  Defendant materially breached the contracts it had entered with Plaintiff and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusions into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiff and members of the Class by:

a.  Failing to properly safeguard and protect Plaintiff's and members of the Class's PII;

      b.    Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement;

      c.    Failing to ensure the confidentiality and integrity of electronic PII that Defendant created, received, maintained, and transmitted; and

      d.    Failing to delete the PII of Plaintiffs and Class Members once Defendant no longer had a reasonable need to maintain it.

190. The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

191. Plaintiff and members of the Class have performed under the relevant agreements, or such performance was waived by the conduct of Defendant.

192. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

193.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

194.    Defendant failed to send adequate Notice to the victims promptly.

195.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

196.    Plaintiff and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

197.    Plaintiff, on behalf of himself and the Class, seeks compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## **FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

198.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

199.    Plaintiff restates and realleges all proceeding allegations above and hereafter as if fully set forth herein.

200.    Upon information and belief, Defendant funds its data security measures from its general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

201.    As such, a portion of the payments made by or on behalf of Plaintiff

and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

202. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they either provided services, in the form of employment, or purchased services from Defendant and/or its agents and in so doing provided Defendant or its agents with their PII. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII protected with adequate data security.

203. Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

204. Plaintiff and Class Members conferred a monetary benefit on Defendant, by paying Defendant as part of Defendant rendering services, a portion of which was to have been used for data security measures to secure Plaintiff's and Class Members' PII, and by providing Defendant with their valuable PII.

205. Defendant was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to avoid the data security obligations at the expense of Plaintiff and the Class by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

206.   Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

207.   Defendant acquired the monetary benefit and PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

208.   If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant either directly or through their own financial institutions.

209.   Plaintiff and Class Members have no adequate remedy at law.

210.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity how their PII is used; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and

money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Class.

211. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm.

212. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## FIFTH CAUSE OF ACTION
### Invasion of Privacy
### (On Behalf of Plaintiff and the Class)

213. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

214. Plaintiff and Class Members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties by applicable laws set forth herein, including but not limited to, state and federal privacy and consumer protection statutes, California common law, and the California Constitution, Art. 1, § 1.

215. Defendant owed a duty to Plaintiff and Class Member to keep their PII confidential.

216.    Defendant's implementation of inadequate data security measures, its failure to resolve vulnerabilities and deficiencies, and its abdication of its responsibility to reasonably protect data it required Plaintiff and the Class to provide and store on its own servers constitutes a violation Plaintiff and the Class's right to privacy.

217.    The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiff's and Class Members' PII, is highly offensive to a reasonable person. It constitutes an invasion of privacy both by disclosure of nonpublic facts, and intrusion upon seclusion.

218.    Defendant's reckless and negligent failure to protect Plaintiff's and Class Members' PII constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

219.    Defendant's failure to protect Plaintiff's and Class Members' PII acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

220.    Defendant knowingly did not notify Plaintiff's and Class Members in a timely fashion about the Data Breach.

221.    Because Defendant failed to properly safeguard Plaintiff's and Class Members' PII, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

222.    As a proximate result of Defendant's acts and omissions, the PII of Plaintiff and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

223.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII is still maintained by Defendant with their inadequate cybersecurity system and policies.

224.    Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their PII. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiff and the Class.

225.    Plaintiff and Class Members, seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' PII.

226.    Plaintiff and Class Members seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Class)

227.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

228.   Given the relationship between Defendant and Plaintiff and the Class Members, where Defendant became guardian of Plaintiff's and Class Members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and Class members' PII; (2) to timely notify Plaintiff and Class Members of the Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

229.   Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

230.   Because of the highly sensitive nature of the PII, Plaintiff and Class members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices.

231.   Defendant breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII.

232.   Defendant also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give adequate notice of the Data Breach within a reasonable and practicable time period.

233.   As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries including but not limited to: (i) invasion of privacy; (ii) lost or

diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

234.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses (as detailed *supra*).

## SEVENTH CAUSE OF ACTION
### Declaratory Judgment
### (On Behalf of Plaintiff and the Class)

235.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

236.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

237.    In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendant's actions were—and *still* are—inadequate and

1    unreasonable. And Plaintiff and Class members continue to suffer injury from the

2    ongoing threat of fraud and identity theft.

3        238.    Given its authority under the Declaratory Judgment Act, this Court

4    should enter a judgment declaring, among other things, the following:

5            a.    Defendant owed—and continues to owe—a legal duty to use

6                reasonable data security to secure the data entrusted to it;

7            b.    Defendant has a duty to notify impacted individuals of the Data

8                Breach under the common law and Section 5 of the FTC Act;

9            c.    Defendant breached, and continues to breach, its duties by failing

10               to use reasonable measures to the data entrusted to it; and

11           d.    Defendant's breaches of its duties caused—and continues to

12               cause—injuries to Plaintiff and Class members.

13       239.    The Court should also issue corresponding injunctive relief requiring

14   Defendant to use adequate security consistent with industry standards to protect the

15   data entrusted to it. Among other things, this should include the following:

16           a.    Order Defendant to provide lifetime credit monitoring and

17               identity theft insurance to Plaintiffs and Class Members;

18           b.    Order that, to comply with Defendant's explicit or implicit

19               contractual obligations and duties of care, Defendant must

20               implement and maintain reasonable security measures,

21               including, but not limited to:

22               i.    engaging third-party security auditors/penetration testers

23                   as well as internal security personnel to conduct testing,

24

1    including penetration tests, and audits on Defendant's

2    systems on a periodic basis, and ordering Defendant to

3    promptly correct any problems or issues detected by such

4    third-party security auditors;

5    ii.    engaging third-party security auditors and internal

6    personnel to run automated security monitoring;

7    iii.    auditing, testing, and training its security personnel

8    regarding any new or modified procedures;

9    iv.    segmenting its user applications by, among other things,

10    creating firewalls and access controls so that if one area is

11    compromised, hackers cannot gain access to other portions

12    of Defendant's systems;

13    v.    conducting regular database scanning and security checks;

14    vi.    routinely and continually conducting internal training and

15    education to inform internal security personnel how to

16    identify and contain a breach when it occurs and what to

17    do in response to a breach; and

18    vii.    meaningfully educating its users about the threats they

19    face with regard to the security of their PII, as well as the

20    steps Defendant's employees should take to protect

21    themselves.

22

23

24

240.  If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

241.  And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class members' injuries.

242.  If an injunction is not issued, the resulting hardship to Plaintiff and Class members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

243.  An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class members, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of all others similarly situated, prays for relief as follows:

    a.  For an order certifying the Class, and naming Plaintiff as representatives of the Class, and Plaintiff's attorneys as Class Counsel;

    b.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

c. For damages in an amount to be determined by the trier of fact;

d. For an order of restitution and all other forms of equitable monetary relief;

e. Declaratory and injunctive relief as described herein;

f. Awarding Plaintiff reasonable attorneys' fees, costs, and expenses as otherwise allowed by law;

g. Awarding pre- and post-judgment interest on any amounts awarded; and

h. Awarding such other and further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of the putative Class, demands a trial by jury on all claims so triable.

Dated: May 26, 2025          By: */s/ Carly Roman*
                             Carly Roman (SBN 349895)
                             croman@straussborrelli.com
                             STRAUSS BORRELLI PLLC
                             980 N. Michigan Avenue, Suite 1610
                             Chicago, IL 60611
                             Telephone: (872) 263-1100
                             Facsimile: (872) 263-1109

                             *Attorneys for Plaintiff and the Proposed Class*